Mr. Chief Justice Sharkey
delivered the opinion of the court.
The appellant filed his bill to foreclose a mortgage, held by him as assignee. The appellee had purchased a tract of land' from T. B. J. Hadley, and gave his bond for $10,000, together with certain promissory notes. To secure the payment, the appellee gave this mortgage on the land purchased by him. Hadley transferred the bond and four of the notes, with the mortgage, to John Ingersoll, in payment of a debt. Ingersoll transferred them to complainant, also in payment of a debt.
Smith, with his answer, filed a cross-bill, making Hadley a party, in which he charges fraud in the sale by Hadley, in many particulars, and prays a rescission of the contract, and that the securities may be cancelled.
For the appellant it is now insisted, that there was no fraud, but if there was, that Smith has waived it by his promises of payment to complainant.
We have thus two questions presented. First, was the sale by Hadley to Smith so tainted with fraud as to justify a rescission of the contract % and second, if it were so, has Smith waived his equity by his subsequent promises 1
In the outset we may as well answer the objection raised by counsel, that as Smith has not been evicted, he must rely upon his covenants in the deed. This is the general rule, but a fraudulent sale is always an exception to it. Parham v. Randolph, 4 How. 435; Liddell v. Sims, 9 S. & M. 596; 5 How. 279, 542; 6 S. & M. 345. In the case of Halls v. Thompson, *130 cited in support of this position, there was nQ fraud found to exist, and for that reason the relief was refused.
First, then, did Hadley commit a fraud in the sale to Smith ? Hadley, it seems, had purchased this same land from Reed in 1834, and had been in possession about two years. It is alleged in the cross-bill that Hadley sold land to which he had no title, falsely representing that he had a perfect title. Several subdivisions of sections are ranged under this head of fraud, but it will be sufficient to notice one eighth of a section, in reference to which the allegation is fully and clearly established ; and that is the east half of the south-east quarter of section thirty, township number eight, of range west, containing eighty acres. This land was situated very near the dwelling, and on it was a spring of water, equal to any in the country; and it was the only water on the place. It is in proof that it was indispensable, and its value to the place incalculable. It is alleged to have been the great inducement to the purchase, and but for that the purchase would not have been made. The witness, James M. Smith, says, that he went with the parties to look at the land, and Hadley pointed it out particularly, and amongst other portions, the eighth on which the spring is situated. Hadley was asked by Wm. Smith if his titles were good and indisputable, to which he replied in the affirmative. He praised the quality of the land and the spring. The witness states positively that Wm. Smith remarked, that he could not be induced to purchase any land unless there was a good and never failing spring on it. The examination of the land was a slight one, and Smith was not on it afterwards until he purchased, which was but a few days after the examination, and the witness was sure it was made more upon the representations of Hadley than from any examination. Hadley spoke of the spring as an inducement to the purchase. The witness stated that Smith had but recently come to the country, and had made many inquiries about a place to put his family on, and had spoken of a good spring of water as the greatest consideration with him. He seems to have formed a determination not to purchase a place on which there was not a spring. Whether he had placed a false estimate on the value *131 of such a thing, is not material. His desire and his object were manifested to Hadley, and he may very well urge his disappointment, which has resulted from the false representations of Hadley, as a reason for a rescission. To a place which is otherwise destitute of water, a spring is an important object. But it is not the spring alone which he has failed to get, but also the eighty acres of land on which it was situated, which is proved to be of good quality. It is clear that Smith understood that he was buying the land on which this spring was, and it is equally clear, that he was induced so to believe from the representations of Hadley, which were untrue, and it would seem knowingly and designedly so, as Reed states that he was particular in showing every part of the tract to Hadley. He did not sell or profess to own the spring tract, nor was there amongst the title papers deposited with Hadley, from which he drew the deed himself, any evidence of title to that eighth of a section. The witness thinks that Hadley intended a fraud on him, by inserting it in the deed, and by omitting other parts of the tract, as on that account objections were raised against payment when called for, unless the witness would submit to a compromise greatly to his prejudice. But whether Hadley knew that he had no title to this part of the land or not, is in no way material. He undertook to sell it and convey by good title, and is bound to make his representations good, or forfeit the contract, as Smith purchased from a confidence in these statements. Deeming this failure a sufficient reason for setting aside the contract, we pass over the other grounds alleged. It seems not improbable that some of the other misdescriptions in the deed from Reed to Hadley, and from him to Smith, may have originated in mistake, since they were evidently prejudicial to Hadley, unless, indeed, he drew the title in that way, as the witness thinks, with a view to a ground of objection to the payment of the purchase money.
In the second place, has Smith waived his equity by his subsequent acts ? A mere, promise to pay to the assignee, after assignment, will not have this effect. Ludwick v. Croll, 2 Yeates, 464; Clay v. Johnson, 6 Monroe, 661. Such a circum *132 stance might be calculated to rebut proof of fraud, or to show its absence. But a promise before assignment, on the strength of which the assignment was taken, would preclude a previous defence, and the reason of this rule will fully apply where only a conditional assignment is made in payment of a previous debt, and the obligor promises payment before the assignor is discharged from the debt, if he is discharged in consequence of such promises. If, then, Ingersoll only made a conditional assignment to Gilpin, and Smith induced the latter to discharge the former, he ought to be bound by it.
There is no evidence of a promise to Ingersoll before he took the assignment, or to Gilpin before he received the paper. But it seems that Smith did make promises to Gilpin’s agent, after he acquired possession, and the witness, who was the agent of Gilpin, says that he did not finally discharge Ingersoll until he had received these assurances from Smith. From this it would seem that the paper was not taken as an absolute payment, but only as collateral security, or on a condition. This is an important point, and, if it is established, must be the hinge on which the case is to turn. Ingersoll was examined as a witness; he says nothing of a conditional assignment; on the contrary, he says he transferred all his right, title and interest in the bond and notes to Gilpin, the precise time he does not recollect, in payment of a debt due to Gilpin; and they were transferred without indorsement, and without any liability on account of them in any way whatever. The complainant does not mention a conditional transfer in his bill. The allegation is “ that on the 28th day of August, 1838, the said John Ingersoll, syndic of the estate of John Ingersoll- & Co. as aforesaid, did, for a valuable consideration, transfer and deliver to your orator, &c., the said bond and promissory notes last mentioned and described, and also made an assignment of the mortgageand in proof of this, the written assignment is made an exhibit, and referred to. The assignment is under seal, was executed in Adams county, and acknowledged in due form, before the clerk of the probate court. It bears date, as stated in the bill, the 28th August, 1838. It is an absolute assignment of the mortgage, the bond *133 and the notes, and expresses to have been made “ for and in consideration of a full acquittance on account of a certain debt,” &c. This is very far from being a conditional transfer; and not only is it an absolute and unqualified transfer, but it is also an absolute and unqualified discharge to Ingersoll; for although. Gilpin did not sign it, he assented to it, and accepted its t?rms by receiving it with the notes and bond. Wharton, however, who was examined as a witness for respondent to the cross-bill, gives rather a different coloring to the subject of transfer. He says he was the agent for Gilpin, and arranged the negotiation for him. Before he took the transfer, he was frequently assured by Ingersoll that Smith had no offsets or defence, as he, Smith, had so informed him in an interview whilst travelling on a steam-boat. The witness, knowing that the laws of Mississippi would allow the maker of a bond or note to bring in any defence which he had before transfer, considered this important. Inger-soll says that he never saw Smith until after he had transferred the notes to Gilpin. He then met him on a steam-boat, and in conversation told him who held the notes. Smith said nothing of a defence to them. Wharton further states that after he received the bond and notes, he made inquiries as to the residence of Smith, but received no information until he met with Harry Hill, who gave him the desired information, and stated to him that Smith desired to know who held the notes, so that he might make some arrangement for their liquidation. The witness thereupon determined to make Smith a visit, which he did, he thinks in December, 1840, and in the course of the evening mentioned his business. He was informed that the notes were given for land, the title to part of which was defective; that the deeds were then in the hands of a lawyer for exmination, and it was uncertain whether the notes would be paid or not. In the morning, however, Smith stated that he had reflected much on the subject during the night, and had determined to accept the offer made, to wit, that the four small notes should be paid immediately, and the payment of the bond should be extended to one. two, three and four years, for which purpose Smith was to *134 visit New Orleans in January, and make the payment at the counting-house of Dick & Hill, where the arrangement was to be completed. This was fully agreed on, and Smith expressed his gratification. It was not until after this arrangement was made with Smith, that the witness, as agent of Gilpin, gave a final discharge to Ingersoll. To the cross interrogatories, he states' that, to the best of his recollection, the assignment was made in the latter part of 1839, or the beginning of 1840; that Ingersoll held many conversations with him on the subject of the transfer, and frequently mentioned his interview with Smith on the steam-boat, but does not recollect the dates of the conversations. The witness compromised the debt due from Ingersoll to complainant, by agreeing to take these and other notes, if, upon inquiry, he should be satisfied that they were good, and after he had adopted such measures as he deemed necessary to insure collection, he discharged Ingersoll. Thinks the negotiation commenced in 1839, and terminated by the discharge of Ingersoll in 1841. We have thus given what seemed to be the substance of Wharton’s testimony, in which what seemed to be unimportant has been omitted. It has been criticised by counsel with much severity, and not without some apparent cause.
The witness says that, before he took the assignment, he had frequent conversations with Ingersoll, who stated the conversation already mentioned between himself and Smith. Ingersoll says he never saw Smith until after the assignment. Pie then met him on a steam-boat, and informed him who held the notes. The witness, Wharton, also says that he did not discharge Ingersoll until after his interview with Smith. This fact he dwelt on much, as it is repeated twice, or perhaps thrice, when no interrogatory was propounded on that point, as counsel probably did not think of proving a fact to be different from the allegation in their bill, and its exhibits. It is a voluntary statement, and seems to indicate, on the part of the witness, a knowledge of the equity jurisprudence of Mississippi, in addition to a knowledge of her laws. In this. particular, it is manifest that the witness was mistaken, as it already has been shown that Ingersoll had been absolutely discharged by the very terms of *135 the assignment in 1838. But he does not say what sort of final discharge he gave. If it was in writing, it should have been produced, or its substance stated.
But suppose the witness really did believe that he had not discharged Ingersoll until after he had received assurances from Smith; as the fact was not so, his belief would not alter the case. The promises of the maker bind him to the assignee, because by them he was induced to take the assignment, and would be deceived and prejudiced by the maker, by permitting him afterwards to bring in a defence. It would be a violation of good faith. But here there is no deception, no breach of good faith, because the discharge was in truth given long before the promises were made. The important question is, did Smith by his promises induce the discharge of Ingersoll ? He clearly did not, because Ingersoll had received a discharge long before. We conclude that the facts present only the case of a subsequent promise — a promise made by the maker to the assignee, after the transfer of the security, the effect of which we have already shown.
But a further consideration presents itself, assuming that the discharge was only given as stated. What was the promise ? It was not absolute, but conditional. Part was to be paid at a certain time and place, and the payment of the balance was to be made in one, two, three and four years. If Smith waived his equity by this promise, he is entitled to exact a compliance with the conditions. And still we hear nothing of an offer to perform by the complainant. By making only a promise to pay on certain conditions, he did not bind himself absolutely.
It is further insisted, that Smith has lost the benefit of his defence by delay. It would seem that the fraud was not discovered until 1840, and in that year Hadley moved to Texas; no delay has occurred- as to him, and he was a necessary party to a bill for rescission. It is not certain when Smith became informed who was the holder of the paper; he says not until a short time before this suit was brought, and there is no proof which shows certainly that he knew who the holder was before the year 1840. This bill was filed in December, 1841, and the *136 answer and cross-bill in February, 1842. We cannot say that this was such delay, under the circumstances, as to preclude him. The law only requires reasonable, vigilance.
The decree of the chancellor is affirmed, and the cause remanded.